THISSEN, Justice (dissenting).
DISSENT
Our job when interpreting a statute is to ascertain and implement the intent of the Legislature. State v. Henderson , 907 N.W.2d 623, 625 (Minn. 2018). The canons of construction and other techniques of judicial interpretation are tools to help us achieve that paramount goal. But we must be vigilant of the warning that "[w]e shape our tools and thereafter they shape us." John M. Culkin, S.J., A Schoolman's Guide to Marshall McLuhan , Saturday Rev., Mar. 18, 1967, at 51, 70. Because the majority fails to see the forest of legislative intent for the trees of grammatical conventions in this case, I dissent.
Our focus in this case is Minn. Stat. § 609.582, subd. 1(b) (2018). The statute provides:
Whoever ... enters a building without consent and commits a crime while in the building ... commits burglary in the first degree ... if: ...
(b) the burglar possesses, when entering or at any time while in the building, any of the following: a dangerous weapon, any article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon, or an explosive[.]
Id.
The majority concludes that the language of subdivision 1(b) plainly and unambiguously means that when a burglary is committed with "an article used or fashioned *7 in a manner to lead the victim to reasonably believe it to be a dangerous weapon," a victim must be present in the building. The majority reaches this conclusion by leaning heavily on a few words-"the victim" and "used"-plucked out of the operative descriptive phrase.
Even if one accepts that the majority's reading is reasonable, it certainly is not the only-or even the most-reasonable interpretation of the statutory language. In assessing whether language is ambiguous, the phrase "an article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon" should not be read in isolation. We have said that "it is an unsafe way of construing a statute to divide it by a process of etymological dissection into separate words, then apply to each thus separated from its context some particular definition given by lexicographers, and then reconstruct the instrument upon the basis of these definitions." In re Raynolds' Estate , 219 Minn. 449, 18 N.W.2d 238, 241 (1945) (citing Int'l Tr. Co. v. Am. Loan & Tr. Co. , 62 Minn. 501, 65 N.W. 78, 79 (1895) ). Rules of construction require that we read and construe provisions of a statute as a whole and interpret the phrase in light of surrounding sections. Eagan Econ. Dev. Auth. v. U-Haul Co. of Minn. , 787 N.W.2d 523, 537 (Minn. 2010).
The focus of subdivision 1(b) is possession of certain items during the burglary. If "the burglar possesses" one of the items described in the statute, he is guilty of first-degree burglary rather than a lesser degree of burglary. Minn. Stat. § 609.582, subd. 1(b). Subdivision 1(b) describes three categories of items, the possession of which elevates the offense to first-degree burglary: "a dangerous weapon," "an explosive," or "any article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon." Id. Further, there is no dispute that mere possession of a dangerous weapon or an explosive-even if another person is not present in the building-is sufficient to elevate a burglary to first-degree burglary. In that context, it is quite reasonable to read the statute to mean that the third item ("an article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon") should be treated the same as the other two items. Nothing in the structure of the statute suggests that the Legislature intended the statute to be a Sesame Street game of "One of These Things Is Not Like the Others."[1]
This reading of the statute is supported when one considers that the possession focus of subdivision 1(b) contrasts sharply with the other two circumstances under which a burglary is elevated to first degree. Under subdivision 1(a), first-degree burglary occurs when the burglary takes place in "a dwelling and another person, not an accomplice, is present in it when the burglar enters or at any time while the burglar is in the building." Minn. Stat. § 609.582, subd. 1(a) (2018). Subdivision 1(c) provides that first-degree burglary occurs when "the burglar assaults a person within the building or on the building's appurtenant property." Minn. Stat. § 609.582, subd. 1(c) (2018). In each case, the presence of another individual is explicitly required. Especially considering *8 the language of subdivision 1(a), the Legislature knew how to make clear and plain that the presence of a person could, in certain circumstances, be an element of first-degree burglary. It did not do so in subdivision 1(b).[2]
Because Minn. Stat. § 609.582, subd. 1(b), can be reasonably read to allow conviction for first-degree burglary for mere possession of "an article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon" regardless of whether another person is present in the building at the time of the burglary, the statute is at the very least ambiguous. See Henderson , 907 N.W.2d at 625 (stating that a statute is ambiguous when it is "susceptible to more than one reasonable interpretation"). And once we turn to the former law that preceded the current statute, the Legislature's intent becomes powerfully clear that mere possession is enough. See Minn. Stat. § 645.16(5) (2018) (instructing that we consider "the former law, if any, including other laws upon the same or similar subjects").[3]
*9 Two categories of items-a dangerous weapon and an explosive-have been part of subdivision 1(b) since the Legislature enacted the current burglary statute in 1983. See Act of June 14, 1983, ch. 321, § 2, 1983 Minn. Laws 2058, 2059. The 1983 version of subdivision 1(b) provided that first-degree burglary occurs when "the burglar possesses a dangerous weapon or explosive when entering or at any time while in the building." Nothing in the language of subdivision 1(b) when enacted in 1983 required that another person be in the building when the burglary occurred. The only requirement for a burglary to be of the first degree under subdivision 1(b) was that the burglar possess either a dangerous weapon or an explosive when entering or any time while in the building. Subdivision 1(a) (burglary of a dwelling where a non-accomplice is present) and 1(c) (assault during a burglary), which each require the presence of another person, were also enacted 1983. Chapter 321, § 2, 1983 Minn. Laws at 2059. Subdivision 1(a) and 1(c) have remained substantively the same over the intervening 35 years. Compare chapter 321, § 2, 1983 Minn. Laws at 2059, with Minn. Stat. § 609.582, subd. 1(a), (c) (2018).
The Legislature, however, changed subdivision 1(b) in 1988. Act of May 4, 1988, ch. 712, § 9, 1988 Minn. Laws 1649, 1654. That year, the Legislature responded to significant public concern about the dangers posed by criminals' use of toy guns.[4] The Legislature amended Minnesota statutes to punish possession of a fake weapon equivalent to possession of a real weapon in both the aggravated robbery and burglary statutes. See id ., § 5, 1988 Minn. Laws at 1651 (codified as amended at Minn. Stat. § 609.245, subd. 1 (2018) ) (aggravated robbery); id. , § 9, 1988 Minn. Laws at 1654 (first-degree burglary). The Legislature also created a new crime that punished making terroristic threats using a replica firearm. Id. , § 15, 1988 Minn. Laws at 1656 (codified as amended at Minn. Stat. § 609.713, subd. 3 (2018) ). To do so, the Legislature needed to find a way to statutorily describe a fake weapon, and it looked to existing statutory language in the first-degree criminal-sexual-conduct statute. See Minn. Stat. § 609.342, subd. 1(d) (1986).
At the time, Minnesota's first-degree criminal-sexual-conduct statute defined that offense (among other definitions) as engaging
in sexual penetration with another person ... if ... the actor is armed with a dangerous weapon or any article used or fashioned in a manner to lead the complainant to reasonably believe it to be a dangerous weapon and uses or threatens to use the weapon or article to cause the complainant to submit.
Id. (emphasis added); see also id. , subd. 1(f)(ii) (using similar language). In assessing the severity of criminal sexual conduct, the Legislature directed that it did not matter whether the assailant used a real weapon or a fake weapon to cause the victim of the sexual assault to submit. The *10 Legislature used the words "any article used or fashioned in a manner to lead the complainant to reasonably believe it to be a dangerous weapon" to describe such a fake weapon. Notably, the Legislature used the words "to lead" rather than "leading" in the provision. The focus of this phrase is on the understanding of the actor about the nature of the item rather than on what the complainant actually believed. Robert C. Farrell, Why Grammar Matters: Conjugating Verbs in Modern Legal Opinions , 40 Loy. U. Chi. L.J. 1, 35 (2008) (citation omitted). The conclusion that the language is a descriptive phrase is demonstrated by the Legislature's inclusion in subdivision 1(d) of an additional requirement that the actor "use[ ] or threaten[ ] to use" the weapon to cause the victim to submit. Minn. Stat. § 609.342, subd. 1(d). This latter part of the sentence sets forth the actus reus, Latin for "guilty act," Actus Reus , Black's Law Dictionary (10th ed. 2014), of the offense including the required complainant reaction (submission). The description of the item-the phrase at issue in this case-and the use to which the item is put are distinct concepts in the criminal-sexual-conduct statute.
In its 1988 amendment to the first-degree burglary statute (as well as the aggravated robbery statute), the Legislature simply lifted the descriptive language from the criminal-sexual-conduct statute and inserted it nearly verbatim into the burglary statute. See chapter 712, § 9, 1988 Minn. Laws at 1654 (changing only the word "complainant" in Minn. Stat. § 609.342, subd. 1(d), to "victim"). Such a wholesale importation of the descriptive phrase "any article used or fashioned in a manner to lead the complainant [victim] to believe it to be a dangerous weapon" from the criminal-sexual-conduct statute into the burglary statute suggests that the descriptive nature of the phrase carries over. In that context, the meaning of the entire phrase is to describe a type of item (a fake weapon) and it should be read that way instead of being lexicographically pulled apart. See Minn. Stat. § 645.08(1) (2018) (noting that phrases that have acquired a special meaning "are construed according to such special meaning"); Eelkema v. Bd. of Educ. of Duluth , 215 Minn. 590, 11 N.W.2d 76, 77-78 (1943) (applying phrase that "had grown to have a well defined meaning"); see also Greenwood Tr. Co. v. Massachusetts , 971 F.2d 818, 827 (1st Cir. 1992) (stating that when a legislative body borrows language from one statute and incorporates it into another, "the borrowed phrases do not shed their skins like so many reinvigorated reptiles"); Felix Frankfurter, Some Reflections on the Reading of Statutes , 47 Colum. L. Rev. 527, 537 (1947) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.").
There is no evidence whatsoever that, in taking the descriptive phrase from the criminal-sexual-conduct statute and importing it into the burglary statute, the Legislature intended to change the essential nature of subdivision 1(b) from a provision where mere possession of a listed item was sufficient to support a first-degree burglary conviction. Rogers asks us to transform subdivision 1(b) into a more complicated provision where mere possession remains sufficient for two of the items (a dangerous weapon or an explosive) but an additional element of proof-that a person also be present in the building-is necessary for the third category of item possessed, namely, a fake weapon. Cf. County of Dakota v. Cameron , 839 N.W.2d 700, 709 (Minn. 2013) (applying the canon noscitur a sociis -Latin for "it is known by its associates"-which requires statutory phrases to be interpreted in light of neighboring statutory language). Occam's *11 razor is a useful interpretive tool for judges.[5]
Admittedly, the Legislature's drafting technique of grabbing language from one statute and inserting it with a minor change into a different statute may have been inartful. But the majority is using the inartful drafting to impose a new element to the crime of first-degree burglary that the Legislature, by any commonsense assessment of the language and history of the statute, never intended. Subdivision 1(b) of section 609.582 makes simple possession of a dangerous weapon, an item that appears to be a dangerous weapon, or an explosive while burglarizing a building a first-degree crime. Rogers had a fake weapon with him while burglarizing J.T.'s house. Consequently, I would affirm the decision of the court of appeals and the district court and uphold Rogers's first-degree burglary conviction.

Viewers of Sesame Street would often be quizzed with the song "One of These Things":
One of these things is not like the others;one of these things just doesn't belong.Can you tell which thing is not like the othersBy the time I finish my song?
See Michael Davis, Street Gang: The Complete History of Sesame Street 162 (2008) (quoting Bruce Hart & Joe Raposo, One of These Things (Instructional Children's Music, Inc. 1970)).

In footnote 6, the majority acknowledges that we should look for interpretive guidance to the entire first-degree-burglary provision. It concludes, however, that the fact that subdivision 1(a) and 1(c) require the presence of another supports its position that one item identified in subdivision 1(b) may also require the presence of another, even if the other two items in subdivision 1(b) do not. This logic is odd. Subdivision 1(b) is about what "the burglar possesses," and no one disputes that possession of two of the three items described in subdivision 1(b) does not also require the presence of another person. Yet the majority's contextual analysis ignores those clues from the specific subdivision in which the language we are interpreting is found and instead looks to other subsections in subdivision 1 that have different purposes.

The principle that courts must always start statutory interpretation by formalistically categorizing a statute as "unambiguous" or "ambiguous," e.g. , State v. Struzyk , 869 N.W.2d 280, 284 (Minn. 2015), is problematic and worth questioning. In particular, the rules for assessing whether language is unambiguous are opaque. It is not clear what level of imprecision in statutory language is required before a statute is found to be ambiguous, and this vagueness allows judges to use the ambiguity inquiry to reach results they desire rather than following the intent of the legislature. See Richard A. Posner, The Federal Courts: Crisis and Reform 276-79 (1985) (questioning canons of construction). I would suggest that one prudent principle to guide the ambiguity inquiry is: "If there is a doubt, err on the side of ambiguity." This principle seems particularly apt in a case where, as here, each party argues for an interpretation of the statutory language that is directly contrary to the other side and each party asserts that its interpretation is unambiguously correct. While not always definitive, such a disagreement is one clue that ambiguity exists. Phone Recovery Servs., LLC v. Qwest Corp. , 919 N.W.2d 315, 326 n.1 (Minn. 2018) (McKeig, J., dissenting).
It is also problematic that judicial adherence to an algebraic process of applying hierarchical rules of interpretation like the pre-ambiguity/post-ambiguity wall that sets certain interpretative tools above others prevents courts from using often very useful materials like legislative history to do our job, which is to ascertain and implement legislative intent. See, e.g. , Robert A. Katzmann, Judging Statutes 52-53 (2014). Indeed, we have said that "the attention of the legislature should always be followed wherever it can be discovered, although the construction seems contrary to the letter of the statute." Barker v. Kelderhouse , 8 Minn. 207, 211 (1863) (citing Grimes v. Bryne , 2 Minn. 89 (1858) ); see also Judd v. Landin , 211 Minn. 465, 1 N.W.2d 861, 863-64 (1942). The majority's critique that I am ignoring precedent begs the question: "Which precedent?" Strict adherence to the interpretive doctrine of the day should yield to judicial humility that we are wiser than our predecessors. And the Legislature itself has instructed us first and foremost that "[t]he object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (titled "Legislative Intent Controls"). Finally, blind adherence to a hierarchy of rules of construction, while ignoring evidence of legislative intent available from so-called "post-ambiguity" sources even when they are useful, raises serious constitutional separation of powers issues. See Posner, supra , at 279.

Contemporary news reports and editorials highlighted this public concern. See, e.g. , Jeanne Landkamer, Editorial, Gun Legislation , White Bear Press, Dec. 9, 1987, at 4a; Brian Bonner, Foley Set to Ask for Tough Toy Gun Law , St. Paul Pioneer Press Dispatch, Dec. 4, 1987, at 1C; Joe Kimball, Tom Foley Takes Aim at Realistic Toy Guns , Star Trib., Dec. 4, 1987, at 1B. In addition to concerns about protecting crime victims, the proponents of the legislation were concerned that use of fake guns created confusion for police officers who respond to a crime and may use harmful force unnecessarily. See, e.g. , Kimball, supra .

Occam's razor is the principle (attributed to William of Occam) that when there are two competing theories that make exactly the same predictions, the simpler one is the better. The American Heritage Dictionary of the English Language 1219 (5th ed. 2011).